VICTORIA COPPER MINING CO. v. RICH.

(Circuit Court of Appeals, Sixth Circuit. November 7, 1911.)

No. 2,117.

1. TAXATION (§ 827*)—INVALID TAX TITLE—RIGHTS OF HOLDER.

Under the Michigan statutes, the holder of a tax title which has been found to be invalid can enforce his lien, as for taxes paid, only in equity, and on the foot of the adjudication against the tax title.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1635–1642; Dec. Dig. § 827.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. **Taxation** (§ 824*)—Invalid Tax Title—Rights of Holder.

The present holder of a tax title, which has been held invalid, can have no lien, as for taxes paid, on account of taxes accruing while the original tax title purchaser was the owner of the life estate.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1632; Dec. Dig. § 824.*]

3. **Tenancy in Common** (§ 30*)—Payment of Taxes—Duty of Cotenant.

The duty which one tenant in common may owe to the state to pay the entire taxes assessed against the whole estate as a unit is to be distinguished from the duty he owes in the same subject-matter to his cotenant. To the state he may owe the duty to pay the whole; to his cotenant his duty is measured by the benefits received or presumed from his possession of the property.

[Ed. Note.—For other cases, see Tenancy in Common, Dec. Dig. § 30.*]

4. **Tenancy in Common** (§ 30*)—Payment of Taxes—Contribution.

When a tenant in common, in actual possession, is claiming from his cotenant contribution on account of the payment of taxes assessed on the entire interest, his right to contribution is measured by his benefits received. If his possession has been under claim of exclusive title, and of a character adverse to his cotenant, he will be conclusively presumed to have received benefits equal to the taxes paid, and he cannot have contribution; but if his possession is not of such adverse character, he may have contribution, in the absence of proof that he received benefits equal to the taxes paid.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 96; Dec. Dig. § 30.*]

5. **Tenancy in Common** (§ 30*)—Taxation—Payment of Taxes—Contribution.

Complainant's mesne grantor took title under a deed purporting to convey eight-twentieths of the fee. The grantor in such deed was the widow of the deceased owner of such eight-twentieths, and claimed to be his successor in title, but was in fact only life tenant, because of the existence of heirs unknown to the grantee. The grantee then had a good title to the remaining twelve-twentieths. After the death of the life tenant, such grantee and his successors for 18 years maintained a custodian in charge of the premises, which were wild, unproductive lands, did occasional acts otherwise indicating possession, and paid the entire taxes as assessed on the unitary title, in good faith believing that they owned the whole title. In an ejectment suit later brought against complainant by one claiming through mesne conveyance from the heirs owning the eight-twentieths, the complainant set up his possession as adverse and as constituting an ouster of the heirs owning the eight-twentieths, supporting the statute of limitations; but it was held otherwise, and the ejectment plaintiff recovered. *Held*, that complainant, in an equitable proceeding at the foot of the ejectment judgment, was entitled to contribution from ejectment plaintiff with regard to the taxes paid during this 18-year period.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 96; Dec. Dig. § 30.*]

6. **Tenancy in Common** (§ 36*)—Contribution—Bona Fide Purchaser from Cotenant.

In an equitable proceeding in the nature of one for contribution between cotenants, defendant's liability for such contribution cannot be escaped by him upon the theory that he is a recent bona fide purchaser of his interest, while ignorant of the claim now sought to be enforced against him, where it appears that he paid only a trifling consideration,

and was to share with his grantor whatever might be recovered by establishing his title.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 105; Dec. Dig. § 36.*]

**7. TENANCY IN COMMON (§ 30*)—RIGHTS OF COTENANT—PAYMENT OF TAXES— LIEN.**

A tenant in common, who is in nominal possession of the entire premises, and who has paid the taxes assessed against the entire title, but who has not ousted his cotenants, and who has not received rents or other benefits from the possession, and who has thus removed' an incumbrance on the common estate, has an equitable lien, without statute and without contract, of the general character of the lien removed, against the title of his cotenants, which he has thus preserved from forfeiture; and he has this lien, even though, when paying, he believed he owned the entire title and has since unsuccessfully endeavored ·to assert this · entire title against his cotenants.

[Ed. Note.—For other cases, see Tenancy in Common, Dec. Dig. § 30.*]

**8. .TENANCY IN COMMON (§ 30*)—REMOVAL OF INCUMBRANCE—LIEN—TRANS-FER.**

Where one tenant in common has· removed an incumbrance from the common estate, and so is entitled to a lien against his cotenant's interest of 'the same character as.that removed. the right to such lie • passes by his quitclaim deed and by an execution sale, which by statute ; Comp. Laws Mich. 1897, § 9167) covers "all the rights and interests that the debtor had."

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 96; Dec. Dig. § 30.*]

Appeal from the Circuit Court of the United States for the Western District of Michigan.

Proceedings supplementary to an ejectment suit by the Victoria Copper Mining Company against Ancil J. Rich. From a judgment for defendant, complainant appeals. Modified and affirmed on condition.

See, also, 163 Fed. 207, 89 C. C. A. 637.

C. D. Hanchette (Hanchette & Lawton, on the brief), for appellant. D. H. Ball (Ball & Ball, on the brief), for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

WARRINGTON, Circuit Judge. This is a proceeding supplementary to an ejectment suit. The appellee was plaintiff in the ejectment suit, and the appellant was defendant. The land in controversy is an undivided eight-twentieths of two quarter sections situated in Ontanagon county, Mich., being the northwest and southeast quarters of section 30, in township 50 N., range 39 W. Upon the first trial verdict and judgment were rendered for defendant; but the judgment below was reversed in this court and a new trial awarded, it being held here that the court below erred in not instructing the°jury to find for the plaintiff. 147 Fed. 380, 77 C. C. A. 558. Upon retrial below verdict was rendered for plaintiff Rich, with a finding as·corrected that · the value of the entire land was $24,119.20, and that the improvements made on the land had not increased its value beyond the waste

*For other :ases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

committed. Rich elected under the statute to abandon the land to appellant and judgment was entered against it for $9,647.70, being the value of eight-twentieths of the land as fixed by the jury. This judgment was held to be a lien upon this undivided portion, and execution was awarded accordingly. Thereupon the present proceeding, equitable in character, was commenced setting up a claim for taxes alleged to have been paid by the Copper Mining Company and its predecessors in title from 1867 to 1907, amounting to $18,130.26, and also for interest thereon under a statute dated April 6, 1869, from the date of the first payment to the date of the last one at the rate of 25 per cent. per annum. An order was also sought to enjoin Rich from enforcing his judgment upon execution, and it was prayed that ultimately the taxes paid and the interest be set off against the judgment. An injunction was issued restraining Rich as prayed in the bill, but subject to certain conditions, among which was one requiring the Copper Mining Company to execute a bond in the penal sum of $15,000, with sureties, conditioned for the payment to Rich of his judgment and interest, unless reduced by an allowance of taxes, and in that event for payment of the balance if any should remain. The rights of Rich to execution upon his judgment and of the Copper Mining Company to the injunction were disposed of by the learned trial judge in an opinion reported in 163 Fed. 211, 212, 89 C. C. A. 637, which was subsequently adopted and the orders there made were affirmed by this court. Id., 163 Fed. 207, 89 C. C. A. 637. In the opinion of Judge Severens in the first citation and that of Judge Knappen in the second one may be found further details of the facts. The result of the present proceeding in the court below was a denial of the right to recover any of the taxes claimed and the granting of a decree against appellant upon its bond for the amount of Rich's judgment with interest and costs.

[1] The right of the mining company to maintain the present proceeding was in our judgment correctly stated below by Judge Knappen:

"It is settled by the decisions of the Supreme Court of Michigan that a proceeding for enforcing this lien (for taxes paid) can be had only in equity; and 'on the foot of the adjudication against the tax title.' Weimer v. Porter, 42 Mich. 569 [4 N. W. 306]; Ellsworth v. Freeman, 43 Mich. 488 [5 N. W. 675]; Tillotson v. Circuit Judge, 97 Mich. 585 [56 N. W. 945]."

The mining company was through mesne conveyances the sole owner of the northeast and southwest quarters of section 30, and of the undivided twelve-twentieths of the northwest and southeast quarters of the section; and Rich was through mesne conveyances the owner of the undivided eight-twentieths of the quarter sections last mentioned. The undivided eight-twentieths interest was formerly owned by Samuel H. Broughton, who died intestate December 3, 1860. He had no issue, but left surviving his widow, Sarah N. Broughton, and his father, Shebuel H. Broughton.

[2] Under the statute of Michigan then in force, the widow took a life estate and the father the remainder in fee in this interest. 147 Fed. 382. 77 C. C. A. 558. The widow died in 1881;

and we agree to the conclusion reached, and for the reasons stated by the judge presiding at the last trial, that the present appellant's predecessor in title, viz., the Victoria Mining Company, acquired the interest of Mrs. Broughton in the land by acceptance of the deed executed in 1866, and, further, that during the time commencing with the conveyance of Mrs. Broughton (in 1866) and ending with her death (in 1881) the company last named was, as holder of her life estate, obligated to pay the taxes assessed and accruing upon the eight-twentieths of the land in dispute. It follows that appellant's right, if any exist, to recover taxes at all it can apply only to taxes paid after the death of Mrs. Broughton.

The main contention made by appellant in the ejectment suit was that under a statute of limitations of Michigan it acquired title to the eight-twentieths by adverse possession maintained through 15 consecutive years. 147 Fed. 383, 77 C. C. A. 558. One of the contentions now made by appellant is that, since its claim of adverse possession failed in the ejectment suit, the court cannot consistently hold that appellant's possession obligated it as a tenant in common to pay the taxes in question; in other words, that, since the possession was not adverse within the meaning of the statute of limitations, it was not such possession as would imply a duty to pay taxes on the undivided interest found not to belong to appellant—at least without right of recovery over against the actual owner. This would seem impliedly to concede that, if appellant was in adverse possession of the undivided eight-twentieths interest during any portion of the time between the death of Mrs. Broughton and the commencement of the ejectment suit (though less than the time prescribed for acquiring title), it was bound during such time to pay the accruing taxes. This implied concession is emphasized by the fact that appellant and its predecessors in title were all the while claiming exclusive title to the whole of the land.

[3] Apart from any concession of counsel, however, we are disposed to hold that the duty of one tenant in common towards his cotenant upon the subject of paying taxes is to be distinguished from his duty on the same subject towards the state. Laying aside for the moment the question of contribution: To the state, tenants in common (in the absence of statute specially authorizing each to pay on his own portion) may, like a mortgagor and his mortgagees, be said each to owe the duty to pay the taxes upon the whole of the property. Conn. Mut. L. Ins. Co. v. Bulte, 45 Mich. 113, 120 to 122, 7 N. W. 707.

[4] The duty of one tenant in common towards his cotenant, or his inability to compel contribution from his cotenant, must in the end rest upon the receipt of benefits, actual or presumed, by the taxpaying tenant equal to the amount of taxes paid. If, under claim of exclusive title, he is maintaining a possession adverse as against his cotenant, then the one in possession will be conclusively presumed to have received benefits equal to the maintenance; but, if his possession is not of such adverse character, he will not, in the absence of proof to the contrary, be presumed to have received benefits.

In Dubois v. Campau, 24 Mich. 360, 367, Campbell, Ch. J., when speaking of the possession of a tenant in common of a city lot and also of a tax title in dispute, said:

"It may be regarded as settled in this state that one in possession of land claiming it as his own is bound to pay the taxes imposed upon it—certainly such as are imposed and become due during such possession."

See, also, Cole v. Cole, 57 Misc. Rep. 490, 108 N. Y. Supp. 124; Clute v. Clute, 197 N. Y. 439, 446, 90 N. E. 988, 27 L. R. A. (N. S.) 146, 134 Am. St. Rep. 891; Wistars' Appeal, 125 Pa. 526, 534, 17 Atl. 460, 11 Am. St. Rep. 917; O'Hara v. Quinn, 20 R. I. 176, 38 Atl. 7.

For reasons that we shall state later, we are not satisfied that appellant's predecessors in title had such possession of the land embraced in the ejectment suit or exercised such control over it between the time of the death of Mrs. Broughton and the date of the deed to appellant as fairly to bring them within the rule quoted and deducible from the decisions just cited. We are of opinion, however, that under the pleadings and evidence appellant itself must be treated as falling within that rule with respect to the time of its own possession. On January 17, 1899, appellant obtained a quitclaim deed (in name but containing a warranty) from Benjamin Howard Coffin, which seems to have embraced, not only the undivided eight-twentieths in question in the northwest and southeast quarters, but the whole of section 30. Appellant, as will be seen later, thereupon entered upon each of the quarters of the section in such a way as to indicate that it claimed title to the whole. By paragraph 5 of its bill filed in this proceeding appellant averred:

"That the said Victoria Copper Mining Company, after the said 17th day of January, 1899, entered into the open, notorious, hostile, and continuous possession of said lands, and have improved the same by erecting buildings thereon and mining thereon and thereunder, and still continues to occupy them as though it was the owner of the whole thereof in fee simple."

This paragraph is admitted by the answer. It will be noticed that these averments and their admission were made after the ejectment suit had been concluded, and no doubt the averments were made to secure the benefit of the statute allowing recovery for improvements made on land. 3 Comp. L. Mich. 1897, § 10,995. Appellant succeeded below in having the value of its improvements upon the land in dispute applied as an offset to the waste committed. We therefore affirm the holding of the court below as to the taxes paid by appellant from 1899 to 1907.

[5] We are thus brought to a consideration of the time intervening between 1881 and 1899. There is a material difference in averment of the bill respecting the possession of the appellant (the Victoria Copper Mining Company) commencing in 1899 and that of its predecessors between 1881 and 1899; the former being "open, notorious, hostile and continuous," including the construction of improvements and the mining of copper on the land, and the latter being that the Victoria Mining Company (note the difference in names of the two companies) entered into possession of the lands, "and occupied the same by its officers, agents, and caretakers" until the title passed to Coffin,

who for a time and his sons thereafter until the title was conveyed to appellant "occupied and used said land by their agents and caretakers as though they were the owners in fee simple of the whole thereof." Appellant's employés, George Hooper and James Walsh, both testified that prior to 1899 there were no buildings on section 30 except on the southwest quarter (land not claimed by appellee); and it does not appear that any mining of consequence was done, or that any improvements of importance were made, even on that quarter section prior to 1899. In speaking of the occupancy of the Victoria Mining Company, Judge Severens summed up the evidence then before the court (147 Fed. at page 384, 77 C. C. A. 562):

"The Victoria Mining Company had located a mining plant on that southwest quarter of the section, but it had never been operated to any extent and had fallen into disuse, and those who had occupied there had removed to other parts. Agents of the mining company occasionally visited the place to see that the property was not being injured, and there was evidence tending to show that they engaged Walsh to look after the premises, and as compensation authorized him to pasture his cattle thereon. There were open tracts on the land, where there had been partial clearings. There was no inclosure of any part of the section or anything to prevent cattle turned on any part from going off into adjoining territory, or to prevent cattle coming in from outside and pasturing these clearings. There was also evidence that at one time a prospective purchaser went there and pumped the water out of the mine, and in doing this cut some timber on the section, on what parts is not clear. The mining company paid the taxes on the whole section some of the years and purchased it at tax sales or from purchasers at tax sales for other years."

There is no pretense that the Coffins ever made any improvements upon any of the lands, or ever attempted to do any mining or otherwise take possession of the property, except such as might be inferred from receiving a sheriff's deed under an execution and another under a tax sale, also paying taxes and afterwards conveying the land by deed to appellant; nor that they ever used the lands or derived benefits from them. True, they allowed a man who had an option to purchase to cut some timber, but that is covered by the finding of the jury in effect that the increment in value arising from appellant's improvements did not exceed the loss inflicted through waste. The most that can be said of the period of time now under consideration is that the Victoria Mining Company and the Coffins claimed ownership and attempted to preserve the status quo, rather than to exercise dominion and control in a sense to signify possession of a character calculated to advise others of a claim of exclusive title. They seemed to be "waiting for something to turn up." Our review of the evidence satisfies us that there is a substantial difference between the acts of appellant and those of its predecessors in title, respecting the matter of possession in the two periods of time now in question. Does this difference amount to such a distinction as should prevent recovery of taxes paid directly by appellant after the date of its deed in 1899, and permit recovery for taxes paid by its predecessors after the death of Mrs. Broughton in 1881? If so, has appellant a right under the present record to recover taxes paid by its predecessors in title?

We are constrained to believe that these questions must be answered in the affirmative. We shall gain a better understanding of the answer

that should be made to these questions by first considering the circumstances under which appellant's predecessors in title paid the taxes and also the failure of the other tenants in common respectively to give any apparent attention to the question of taxes. We think it is safe to say of the evidence that there is nothing to show that the Victoria Mining Company or the Coffins knew or had any reason to believe that Shebuel H. Broughton was living at the date of the death of his son Samuel, until appellant's suit in ejectment was commenced. Shebuel resided in the state of California; and in 1867 the judge of probate of Ontanagon county, Mich., made an entry in a certain proceeding finding that Shebuel was dead at the decease of his son Samuel. 147 Fed. 382, 77 C. C. A. 558. It may, therefore, be assumed that the taxes were paid in good faith and in the belief that they were paid on property owned as an entirety, and not in common. In all that time, a period of 23 years, although Shebuel H. Broughton in fact survived the life tenant (his daughter-in-law) nearly 10 years, neither he nor any of his successors in title ever paid any of the taxes accruing on the undivided eight-twentieths interest after the death of the life tenant, and, of course, not before; and appellee did not tender or offer to repay any of such taxes when he commenced his ejectment suit, and he has denied all liability to contribution in that behalf ever since the present bill was filed. Since all question of waste as before stated was settled at the trial below, there is no perceivable reason why at least a moral obligation does not rest upon appellee to make such contribution. We find no evidence tending to show receipt of benefits during the period now under consideration.

Surely, it would hardly be claimed that Shebuel H. Broughton did not know that he was entitled under the law of Michigan to the remainder in fee upon the death of his son, or that he did not know that under the law of the state he was liable for taxes upon the undivided eight-twentieths of the land after the death of his daughter-in-law; and this must likewise be true of his successors in title. G. F. Sanborn Co. v. Alston, 153 Mich. 463, 466, 117 N. W. 625.

[6] It is claimed, however, that Rich through his grantor is clothed with the rights of a bona fide purchaser. True, his immediate grantor purchased the rights of the devisees of Shebuel H. Broughton for the practically nominal sum of $300, and then conveyed to Rich by quitclaim deed reciting a payment of $350; but Rich admitted that he did not pay any cash consideration, and, on the contrary, that he and his grantor entered into a sort of litigation partnership for a division of the proceeds of recovery. This is also true as to his grantor and Shebuel H. Broughton's devisees, from whom Rich's grantor obtained title. We do not think that either Rich or his grantor is entitled to further consideration as a bona fide purchaser.

Judge Cooley in his work on Taxation (2d Ed.) p. 467, stated the rule as to tenants in common thus:

"Each tenant in common is bound to pay the tax on his own interest; but, if one is compelled to pay upon all, he may charge the interest of his cotenant with the proportionate part which such cotenant should have paid."

In Connecticut Mut. L. Ins. Co. v. Bulte, 45 Mich. 113, 121, 7 N. W. 707, 709, before cited, Judge Cooley passed upon a question somewhat analogous in principle to the problem we have to solve. In that case the insurance company held a second mortgage on property and caused it to be foreclosed, and the property to be bid in through its general attorney, who in his own name also obtained a tax deed of the property, and, after the tax title had become absolute, gave a quitclaim deed of the property to the company. Subsequently the first mortgagee caused his mortgage on the same property to be foreclosed, and he became the purchaser and received a deed. The insurance company leased the premises to another, who took possession, and afterward the mortgagee and purchaser under the first mortgage brought ejectment against the insurance company and its tenant. The right of the second mortgagee to rely upon the tax purchase as against the right of the first mortgagee to recover in ejectment after foreclosure was the only question in the case. In his consideration of the question the learned judge several times by way of analogy spoke of the duties of tenants in common in connection with the duties of mortgagees who hold mortgages on the same property. Referring to a tenant in common, Judge Cooley said:

"His duty is limited to paying the tax on his share only; and, if the cotenant neglect to pay for himself, what right has he to demand that those who happen to have interest with him in the land shall be excluded from the number who may take advantage of his default? The reason usually assigned for not permitting such a purchase is that the sale is based in part upon the purchaser's own default, but it is also true that in a great proportion of such cases the parties stand to each other in confidential relations; and it may without much violence to the facts be assumed that they do so in all cases. No doubt the rule that precludes their speculating in each other's defaults is grounded on sound policy. Still the purchaser does not lose what he pays beyond what is needful for discharging the lien upon his own interest. His cotenants must refund to him such portion as is found to be just."

Continuing after the citation of a number of decisions:

"The purchaser is trustee for the others, but they must repay their proportion of his advances."

Full recognition was given to the rule that neither of the mortgagees owed a duty to the other or to the owner to pay the taxes; but it was said (45 Mich. 122, 7 N. W. 710):

"To the state each one of the three may be said to owe the duty to pay the taxes; and the state will sell the interest of all if none of the three shall pay. As between themselves, the primary duty is upon the mortgagor; but, if he makes default, either of the mortgagees may pay, and one of the two must do so or the land will be sold and his lien extinguished."

In the absence of other circumstances which would impose the duty on one of two tenants in common to pay the taxes, it is hard to see why the principle thus stated by Judge Cooley should not be applied to tenants in common. It was said of the first mortgagee in that case (45 Mich. 123, 7 N. W. 710):

"Bulte brought ejectment, without tendering any repayment of the tax or of any part thereof, but leaving the whole to be borne by the insurance company as a total loss. Is there any equity in this? Can a principle of

law which purports to be an equitable principle support this suit? * * * Sometimes a party by the force of circumstances is placed in a position where another may take the profit of his losses without being under obligation to make return; but the adjustment of legal rights on equitable principles is never meant to work such a result."

The verdict in that case having been given in favor of the plaintiff in the ejectment suit, the judgment upon it was reversed because of the failure of the court below to recognize the equitable principles which are in part above set out.

In Eads v. Rutherford, 114 Ind. 273, 274, 16 N. E. 587, 588 (5 Am. St. Rep. 611), it is stated with respect to tenants in common and the right of one to require contribution from his cotenant for taxes paid by him, though nothing appears in the case touching possession:

"The general rule undoubtedly is that one tenant who has paid an incumbrance may compel contribution from his cotenants. 1 Story, Eq. Jur. § 505; Freeman, Cotenancy, §§ 322, 512. This is a sound and salutary rule, and we cannot conceive why it should not apply to this case, for the taxes were a burden on the land from which it could be relieved only by payment."

To the same effect: Smith v. Mount, 149 Mo. App. 668, 674, 129 S. W. 722; Downer's Adm'r v. Smith, 38 Vt. 464, 467; Fallon v. Chidester, 46 Iowa, 588, 593, 26 Am. Rep. 164; Allen v. Allen, 114 Wis. 615, 630-632, 91 N. W. 218; Kites v. Church, 142 Mass. 586, 588, 8 N. E. 743; Morris v. Roseberry, 46 W. Va. 24, 29, 32 S. E. 1019; Watkins v. Eaton, 30 Me. 529, 535, 50 Am. Dec. 637.

[7] Difficulty arises from the fact that, after 1882, there does not seem to have been any statute in Michigan, as there was prior to that time, which in terms transferred the lien of the state for taxes to the person paying them. Croskery v. Busch, 116 Mich. 288, 74 N. W. 464. True, there was a statute in 1885 that operated to transfer the state's lien to any person claiming under a tax deed; but the right to enforce the lien was limited to two years and need not be further noticed for that reason. 3 How. Ann. St. Supp. p. 2933, § 1169w7. Appellee specially relies in this case upon a statute of 1869, which transferred to the purchaser under a void tax sale the lien of the state for taxes; but that statute was repealed March 14, 1882. Sess. Acts, p. 43.

The question comes to be whether both the presence of a tax lien and its transfer by statute are essential in a case like this. The decision in Croskery v. Busch, supra, does not seem to us to be in point, because the person who paid the taxes there sought to be recovered was at the time a stranger in title to the land. It was of no sort of legal concern to him whether the taxes assessed against the land were paid by the owner or not, and he was held to have been a volunteer. Nor does Homestead Co. v. Valley Railroad Co., 17 Wall. 153, 166, 21 L. Ed. 622, seem to us to be applicable. There the parties were hostile contestants as to the title to certain land, and consequently bore no such relations as exist between tenants in common. The taxes in dispute were paid by one of the plaintiffs during the litigation, and it was held that the refusal or neglect of the defendants to pay the taxes (although they were ultimately found to be the owners of the title) did not authorize any of their contestants to make defendants their debtors by (17 Wall. 167, 21 L. Ed. 622)

"stepping in and paying the taxes for them, without being requested so to do. Nor can a request be implied in the relation which the parties sustained to each other. There is nothing to take the case out of the well-established rule as to voluntary payments."

One feature of the decision on rehearing in G. F. Sanborn Co. v. Alston, supra, 153 Mich. 464, 117 N. W. 625, has, we think, more pertinence here than has the decision in either Croskery v. Busch or Homestead Co. v. Valley Railroad. In the opinion rendered on rehearing in the case of the Sanborn Company, when determining the right of an owner of land to demand a reconveyance from the holder of a tax title, who was claiming among other things to recover payment of taxes paid by him after the date of the tax sale, the court said that such owner ought in justice and equity to be compelled to "pay those taxes which the purchaser has been compelled to pay or otherwise lose his title or lien," and reference with apparent approval was made to rules prevailing in Arkansas and Iowa thus:

"It is also held that where a party pays the taxes in good faith, claiming title but having none, he is entitled to a reimbursement out of the land."

The rule of the Sanborn Co. Case was applied in favor of a stranger in title, except as a holder of a tax title. In the present case a tenant in common in fact averted a sale of the land for taxes by paying them, and, in effect, avoided the imposition of an incumbrance upon the other cotenants' interest. True, the Sanborn suit was brought on the equity side of the court to quiet title and to secure an injunction; but, after all, appellee is insisting upon enforcing a judgment for the value of the land and in the same breath defending against contribution for taxes, the payment of which preserved the very title upon which his judgment is founded. Adopting the language of Judge Cooley in Connecticut Mut. L. Ins. Co. v. Bulte, before cited (45 Mich. 123, 7 N. W. 710), "Can a principle of law which purports to be an equitable principle" support such a defense?

The Legislature of the state, at the time it repealed the act of 1869, before pointed out, enacted a law providing that:

"Taxes thus assessed shall become at once a debt to the township from the persons to whom they are assessed, and the amounts assessed on any real property shall, on the first day of December, become a lien on such real property, and the lien for such amounts, and for all interest and charges thereon, shall continue until payment thereof." Sess. Acts 1882, p. 16, § 26; 1 How. Ann. Stat. p. 1273.

This provision seems to have been preserved throughout the period we are now considering. 1 Comp. L. Mich. 1897, p. 1209, § 3863. It is objected, however, that payment of the taxes operated simply to extinguish the lien. Is this true in respect of interests held in common? The taxes paid by appellant's predecessors in title were until paid both a debt to the township and a lien on the land. If appellant's predecessors had suffered the land to be sold for taxes, they could not have purchased it and obtained a tax deed and title without subjecting themselves to the charge that the cause of the default in payment was as much theirs as it was that of their cotenants. Any title they might have so obtained would consequently have inured to the

benefit of their cotenants upon payment by the latter of their proportion of the taxes. This has been held even against a purchaser of an undivided interest in land, whose purchase occurred after the other cotenants had paid the taxes. Young v. Biggar, 73 Kan. 146, 150, 84 Pac. 747, 749. The purchaser there claimed title to the land entire, but his recovery was limited to an undivided portion. The decision was rendered in 1906, and, according to the statute of Kansas (2 Gen. Stat. 1897, p. 904, § 138), the lien for taxes was to "continue until such taxes  *  *  *  shall be paid by the owner of the property or other person liable to pay the same." On the question of the right of his cotenant to contribution, it was said:

"The taxes paid by the defendants upon the part of the property owned by Allen gave them a lien upon it, as against him. 17 A. & E. Enc. 686. Biggar, when he bought from Allen, received only a quitclaim deed. He therefore stood in the shoes of the grantor. He acquired no higher right than Allen had had, and took the property charged with this lien. There is no showing that, when these taxes accrued or were paid, the defendants had ousted their cotenants, or were in the receipt of any income from the property. We therefore think the court erred in not allowing the defendants credit for the taxes they had paid in excess of their due proportion."

In Fiacre v. Chapman, 32 N. J. Eq. 463, 465, it was contended by a first mortgagee that payment by a second mortgagee of taxes assessed against the land operated to discharge the lien; but it was held:

"If it be conceded that the lien was discharged by the payments, that will not deprive Mr. Mitchell of his right of reimbursement for the payments out of the property in advance of the lien of the complainant's mortgage."

That case was cited with approval in Noeker v. Howry, 119 Mich. 626, 629, 78 N. W. 669. See, also, Reed v. Reed, 122 Mich. 77, 80 N. W. 996, 80 Am. St. Rep. 541.

These cases are suggestive of a class of familiar decisions relating to the mutual rights and duties of tenants in common, which we think may now be profitably considered. We allude to decisions which lay down the principle that, where an estate is incumbered by a lien and is held in common, one tenant in common who has removed the incumbrance is entitled to an equitable lien upon the interests of his cotenants of the same character as that of the lien removed. Why is not that principle applicable here? True, a tax lien is not created by contract; but the duty to discharge it is quite as incumbent upon one tenant in common as upon another. When one of them discharges the whole duty by paying all the taxes, he is obviously in part discharging a duty of his cotenants. Where one acting upon the belief that he is the sole owner of given land and in ignorance of the existence of a tenancy in common therein pays all the taxes assessed against it, can it be said that he is not in truth rightfully discharging in part the duty of his cotenants? He is certainly less open to the charge of being a volunteer where he pays the taxes in ignorance than where he does so with knowledge of the fact of a tenancy in common. It would therefore seem to be a more salutary rule, in cases where no conclusive presumption arises touching receipt of benefits as before stated, to encourage the payment of taxes by allowing contribution

as a condition of recovery of the interest in fact held in common than by denying such allowance. Nor are we able to see that the nature of the incumbrance can be important. It is no answer to say that the tax lien is extinguished by the payment; for a lien on the common estate is none the less removed, and the act of removal embraces the performance of a duty that is no less incumbent on the defaulting cotenant than on the paying cotenant. It is the relation and duty of cotenants to one another which entitles the holder of one undivided portion to fasten a lien on the land similar to the one that he has removed from the portion of his cotenant.

Thus, in Wilton v. Tazwell, 86 Ill. 29, 31, it appeared that one tenant in common had paid $1,500 for the release of a dower and homestead interest in the land. Respecting a claim for contribution, it was objected that a dower and homestead were not such incumbrances on the premises as one tenant in common might remove and also compel contribution, for the reason that the release of the widow conveyed no interest but simply extinguished her claim. This contention was denied; and, as a result of the court's treatment of the question in its opinion and its view of decisions cited in its support, it was said:

"Thus it is seen that in this class of cases a cotenant may have a burden or liability imposed upon him without his consent. Nor can he, by refusing to aid in the payment of taxes, or removing an incumbrance or acquiring an outstanding title that endangers their title, escape liability. So of money necessarily expended to preserve the property and keep it in repair."

Expressions of this principle in different forms as applied to a variety of conditions and facts are found in many reported decisions, but they all tend to the same result. In Hurley v. Hurley, 148 Mass. 444, 19 N. E. 545, 2 L. R. A. 172, land held in common and sold for nonpayment of taxes was redeemed by one of the tenants in common; and, although he failed in some respects to observe the mode prescribed by statute of the state giving the paying tenant in common a lien on the interests of his cotenants, it was held, the present Mr. Justice Holmes announcing the opinion, that since the taxes were legally paid, the one paying them was "entitled to have the lien kept alive for his benefit until the petitioner (for partition) shall have paid his share. Until that time, the petitioner has no right to the possession of any part of the land, in equity or at law."

In Titsworth v. Stout, 49 Ill. 78, 80, 95 Am. Dec. 577, it is held in respect of removal of an incumbrance upon a common estate by one tenant in common that a right of contribution results, and that a court of equity will enforce a lien of the same character as that of the lien removed. This is said to be a "familiar principle." To the same effect: Moon v. Jennings, 119 Ind. 130, 135, 20 N. E. 748, 21 N. E. 471, 12 Am. St. Rep. 383; McLaughlin v. Estate of Curts, 27 Wis. 644; Oliver v. Montgomery, 42 Iowa, 36; McClintock v. Fontaine (C. C.) 119 Fed. 448. Even where a second mortgagee pays off a first mortgage without taking a formal assignment, he will be treated in equity as an assignee, and as entitled to resort to all suitable remedies to enforce payment. Mattison v. Marks, 31 Mich. 421, 422, 18 Am. Rep. 197.

The practice of courts of equity to allow an innocent purchaser of land who has made improvements upon it, without notice of any infirmity in his title, to recover a sum equal to the added permanent value of the estate, ought, as it seems to us, to be applicable to a case like this. The right and lien thus enforced are not traceable to contract. They arise out of the consideration that the true owner of the land ought not in good conscience to be permitted to receive and enjoy such an increment of value to his land without remuneration. Statutes allowing recovery in such cases are but declaratory of this doctrine, no matter by what name they are called. Bright v. Boyd, 2 Story, 605, 607, Fed. Cas. No. 1,876, opinion by Justice Story. See, also, the learned opinion which was rendered by him in the same case. 1 Story, 478, 495–499, Fed. Cas. No. 1,875. And the right to maintain an independent bill in equity was there sustained for the purpose of enforcing the right of recovery and lien for the improvements. Plainly, no greater benefit in character to land can be ascribed to the act of one (having no title), who, through expenditures made to improve the land, increases its value, than should be accorded to a tenant in common who, through payment of taxes levied upon the common estate, preserves the title and estate of his cotenants. Especially is this true where, as here, a cotenant paying the taxes does so without notice of any defect in his title, and believes that it extends to the whole property as an entirety. Indeed, the rule is that a cotenant making improvements upon the common estate for the common benefit is entitled to contribution. Davidson v. Wallace, 53 Miss. 475, 479, and citations there found. We therefore hold that appellant's predecessors in title could themselves have respectively maintained a suit against the owner of the undivided eight-twentieths in dispute to charge the interest with a lien for the taxes severally paid by them.

[8] As regards the right of appellant through set-off against the judgment obtained against it in the ejectment suit to recover the taxes paid by such predecessors after 1881, it will be recalled that it acquired the property by a quitclaim deed in form but containing a covenant of warranty. It need only be stated that whatever rights its predecessors had in the land passed by such a deed without regard to the covenant of warranty. Moelle v. Sherwood, 148 U. S. 21, 29, 30, 13 Sup. Ct. 426, 37 L. Ed. 350. It must follow that the rights of the prior owners who paid the taxes passed by the deed as against the original cotenant or one not a good-faith purchaser; for the rule in Michigan does not differ from the general rule that rights of this character may be transferred or assigned. The elder Coffin (G. Winthrop Coffin) obtained the right and title in the land of the Victoria Mining Company upon an execution sale; and by statute the purchaser acquired "all the rights and interests that the debtor had in and to the lands so sold, at the time of the levy by virtue of the execution." 3 Comp. L. Mich. 1897, § 9167. After his death, appellant's grantor, a son of G. Winthrop Coffin, acquired by deed the portions of the others of G. Winthrop Coffin's family in his estate, and, as before stated, conveyed to appellant the entire interest in the land as originally held

by the Victória Mining Company. We see no reason why the rights of the Victoria Mining Company, as well as those of the Coffins, who paid the taxes on the land, were not so transferred and assigned to appellant.

We are therefore of the opinion that the decree of the court below must be modified by the allowance of a set-off against the judgment entered in the ejectment suit, to the extent of the taxes paid upon appellee's interest between the years 1881 and 1899. This cause has been in litigation upon one question or another for about seven years, and it ought, if practicable, to be brought to a close. While the evidence as to the sums paid and their proper apportionment is not entirely satisfactory, still we think it reasonably sufficient to enable us to dispose of the case. There is evidence tending to show what taxes were paid in those years. We include 1881 and exclude 1899. According to our understanding the total sum so paid on the eight-twentieths was $345.91. Upon this sum interest will be allowed from the dates of the several payments to the date of the judgment in the ejectment suit at the legal rates prevailing from time to time within that period. This modification is made on these conditions: (1) That Rich shall have the privilege to withdraw his execution and also his election to abandon the eight-twentieths interest in the land and take instead a judgment of possession upon filing in the cause his election to do so and paying into the court below for the use of appellant a sum of money equal to the amount of the set-off and interest allowed; and (2) that the Victoria Copper Mining Company shall consent that Rich shall have such privilege.

To the end that further proceedings, not inconsistent with this opinion, may be had in the court below, the decree is reversed and the cause remanded, with costs of this appeal; but in case Rich shall, within 30 days from the day of the filing of this opinion, file in this court his written consent that the judgment obtained in the ejectment suit be reduced to the extent stated in this opinion, then the decree below as so modified shall be considered and treated as affirmed by this court, excepting that the award of costs to Rich in this cause in the court below shall be set aside and neither party shall recover costs in that court, and appellant shall recover the costs of this appeal.